UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-60055-TP-DIMITROULEAS

UNITED STATES OF AMERICA,

        Plaintiff,

        vs.

RALPH GLEN HINES,

        Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on counsel Michael Entin, Esquire's Emergency Motion for Relief as to Status of Restitution Payment (DE 21), which was referred to United States Magistrate Judge, Lurana S. Snow, for Report and Recommendation.  The Motion seeks a determination from this Court of whether $25,000 deposited into the Trust Account of Mr. Entin, counsel for Defendant **Ralph Glen Hines**, should be paid as part of the Defendant's restitution obligation or returned to the sender.

## I. FACTS PRESENTED

A hearing was held on the motion on July 19, 2012 and continued to July 31, 2012. On July 19, 2012, Mr. Entin proffered as an officer of the Court that Defendant **Ralph Glen Hines** was arrested for violations of supervised release on May 16, 2012.  The Defendant retained Mr. Entin to represent him, and discussed with Mr. Entin a plan to raise a sum of money to pay toward the Defendant's restitution obligation, in mitigation of sentencing on the supervised release violation. The Defendant informed Mr. Entin that the sum of $25,000 would be deposited into Mr. Entin's Trust Account for this purpose.  On July 6, 2012, Mr. Entin received the $25,000.  He did not receive any instructions or limitations on the use of the money from anyone other than the Defendant.

One week later, on July 13, 2012, the Defendant was sentenced to three months incarceration for his violation of supervised release. This sentence represented a downward variance which was based in part of the Defendant's promise to pay $25,000 in partial satisfaction of his restitution obligation. (DE 18-20, 26) Following the sentencing, Mr. Entin received a telephone call from Mr. Phillip Sheridan, who claimed to have sent the $25,000 to Mr. Entin. Mr. Sheridan told Mr. Entin that the money was intended for a business transaction and was not to be paid to the Court. Mr. Entin at first believed that Mr. Sheridan had called him by mistake, since Mr. Entin has exclusively practiced criminal law and he has never handled any civil matters. However, Mr. Sheridan reiterated that the money was not deposited for the benefit of the Defendant and he threatened to sue Mr. Entin if he disbursed the funds to the Court.

Mr. Entin then filed the instant motion seeking a determination from the Court regarding what should be done with the $25,000. Mr. Entin stated that he had informed Mr. Sheridan of the hearing, but Mr. Sheridan advised Mr. Entin that he would be unable to attend. Mr. Entin called as a witness Mr. Richard Wellman, the President of Acme Aircraft and Parts Emporium, which was the entity which had deposited the $25,000 into Mr. Entin's Trust Account. Mr. Wellman testified that he has known Mr. Sheridan for 40 years and has had many business transactions with him. Mr. Wellman stated that he loaned Mr. Sheridan $150,000 pursuant to a written contract (Sealed Court Exhibit 1 [DE 28-1]), and had caused the $25,000 to be deposited in Mr. Entin's Trust Account upon instructions from Mr. Sheridan. The remaining amount was wired by Mr. Wellman to the trust account of another attorney. Mr. Wellman did not know the Defendant and had no knowledge that the $25,000 was to be used to pay restitution on the Defendant's behalf.

At the conclusion of the hearing, all parties agreed that the testimony of Phillip Sheridan was required. Mr. Entin and Mr. Wellman each had a telephone number for Mr. Sheridan and had spoken to Mr. Sheridan while he was in the area of Orlando, Florida. Neither Mr. Entin nor Mr. Wellman had an address for Mr. Sheridan. The undersigned continued the hearing until July 31,

2012, and instructed the Government to attempt to locate Mr. Sheridan and subpoena him for testimony at the hearing.

On July 31, 2012, Mr. Sheridan testified pursuant to Government subpoena. After some hesitation, Mr. Sheridan provided his home address in Everglades City, Florida. He stated that he was the President of Sedilia Holdings, Ltd., a Turks and Caicos corporation which handles securities of various types. Mr. Sheridan has known the Defendant for three years, during which time the Defendant assisted Mr. Sheridan with securities and loan transactions in other countries, particularly Venezuela. Mr. Sheridan explained that one of the services he provides is to pay bills in the United States for people in Venezuela in a manner which avoids wire transfer and the unfavorable exchange rate in Venezuela.

Mr. Sheridan further testified that the Defendant had assisted him in at least 20 different business deals, but had been paid on only one occasion. Mr. Sheridan identified Sealed Court Exhibit 1 as a contract which he had prepared in connection with a $3 billion transaction. The contract provided that $150,000 was to be sent to an attorney in Virginia and $25,000 was to be sent elsewhere. Mr. Sheridan understood from the Defendant that the additional $25,000 was to be paid to various people in the United States who were assisting in the transaction. He admitted that there was no list of the people to be paid or any written documentation of the purpose for which the $25,000 was to be used.

Mr. Sheridan testified that he did not know about the Defendant's prior conviction until July 13, 2012, when he learned that the Defendant was in jail. He never intended the $25,000 to be paid toward the Defendant's restitution. Mr. Sheridan had obtained the wiring instructions for Mr. Entin's Trust Account from the Defendant via email. He provided that information to Mr. Wellman, who had loaned money to Mr. Sheridan in the past, including loans for Mr. Sheridan's personal use.

Mr. Sheridan stated that the Defendant's compensation for his work on the $3 billion transaction was to be in the form of a job as bank manager after Sedilia Holdings purchased a bank

in Antigua with the proceeds of the $3 billion deal. Mr. Sheridan conceded that he did not call Mr. Entin about the $25,000 until July 16, 2012, after he learned of the Defendant's incarceration. He denied threatening to sue Mr. Entin.

The Defendant testified that he had known Mr. Sheridan for three years and had participated in 30 to 50 business deals with him. The Defendant stated that Mr. Sheridan had presented him with a $3 billion Venezuelan bond and asked the Defendant to verify it. The Defendant explained that he had many years of legitimate professional experience in verifying bonds. The Defendant ascertained that the bond was valid, but was missing two pieces of information needed before Sedilia Holdings could lawfully own the bond. He determined that it would cost approximately $65,000 to obtain the necessary items. Mr. Sheridan did not have this amount of money, and the bond was put aside in favor of other business transactions.

Some time later, Mr. Sheridan presented the Defendant with several bonds with a total face value of $16 billion, including the $3 billion bond which the Defendant previously had examined. Each of the bonds was missing the same two pieces of information. The Defendant did not know how Mr. Sheridan came to be in possession of the bonds.

The Defendant told Mr. Sheridan that the information for the $3 billion bond could be obtained through a New York bank for a total fee of $150,000. This arrangement involved payments to various people in the United States. There was no discussion of the amount of the Defendant's commission. Mr. Sheridan instructed the Defendant to get it done and agreed to the $150,000 fee.

Subsequently, the Defendant discovered that the needed items could be obtained more cheaply through a Panamanian bank, without the need to pay any individuals in the United States. As a result, the Defendant determined to use $25,000 of the money for the deal to pay toward his restitution obligation. He did not discuss this with Mr. Sheridan, but believed that this was a reasonable amount of compensation for his work on this transaction, as well as three years worth of work for Mr. Sheridan for which the Defendant had not been paid. The Defendant added that he was

4

to have only a small role in one of two banks Sedilia Holdings was to purchase with the proceeds of the bond, and this was not to be compensation for his role in securing title to the $3 billion bond for Sedilia.

The Defendant testified that as of July 6, 2012, when the money was wired to Mr. Entin and the attorney in Virginia, his role in the bond deal had been completed. It was the Defendant who had the contacts in Venezuela and with the Virginia attorney, and there was no reason why the transaction could not have been completed successfully without further action by the Defendant. The Defendant speculated that Mr. Sheridan may have panicked when he discovered that the Defendant was incarcerated.

At the conclusion of the hearing, Mr. Entin introduced into evidence the wire transfer confirmation for $25,000 deposited into his trust account dated July 6, 2012. (Sealed Court Exhibit 2 [DE 28-2]). After the hearing the undersigned noted that the wire transfer confirmation (Sealed Court Exhibit 2) designates Mr. Entin's account as an "Operating Account" not a "Trust Account." Mr. Entin has filed a Sealed Sworn Affidavit (DE 29-2) from the Vice President of Operations of Regent Bank, stating that the wire transfer confirmation incorrectly noted the title of the account and that the $25,000 was correctly deposited into Mr. Entin's Trust Account.

## II. FINDINGS AND RECOMMENDATION

The undersigned finds that on July 6, 2012, Mr. Sheridan caused to be deposited into Mr. Entin's trust account the amount of $25,000. The money was sent by Richard Wellman through Acme Aircraft and Parts Emporium at the direction of Phillip Sheridan. There were no restrictions or instructions to Mr. Entin as to what was to be done with the funds. Mr. Wellman testified that the $25,000 was a personal loan to Mr. Sheridan. The only instructions to Mr. Entin regarding the purpose of the money came from the Defendant, who stated that it was to be used in partial payment of his restitution obligation. Mr. Entin had no prior knowledge of Mr. Sheridan or Mr. Wellman and no professional relationship with either man. After the telephone call from Mr. Sheridan on July 13, 2012, Mr. Entin took appropriate action by seeking guidance from the Court on how to proceed.

There was no evidence presented at the hearing to suggest that the money should not be paid to the Court for purposes of restitution, as previously ordered by this Court, and the sentence imposed by the Court should remain as entered.

### III.  CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that counsel Michael Entin, Esquire's, Emergency Motion for Relief as to Status of Restitution Payment (DE 21) be GRANTED, and that an Order be entered directing Mr. Entin deposit the $25,000 with the

Financial Analyst Unit
Clerk of the U.S. District Court
Eastern District of North Carolina - Western Division
310 Newburn Avenue
Raleigh, NC  27601

as previously ordered.

The parties will have 14 days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with The Honorable William P. Dimitrouleas, United States District Judge.  Failure to file objections timely shall bar the parties from attacking on appeal factual findings contained herein.  LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1998), cert. denied, 488 U.S. 958 (1988); RTC v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 12th day of September, 2012.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

All Counsel of Record

U.S. Probation (FTL)